**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Nicholas Dodge Bruesch, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **RE PENDING SUMMARY JUDGMENT** |
| vs. | ) | **MOTIONS** |
| | ) | |
| Robyn Schmalenberger, Patrick Branson, | ) | |
| Tammy Homan, Darlyn Kunz, and | ) | |
| Marlane Middlestead, | ) | Case No. 1:13-cv-077 |
| | ) | |
| Defendants. | ) | |

Before the court are cross motions for summary judgment by plaintiff Bruesch and defendants. For the reasons set forth below, it is recommended that defendants' motion be granted, Bruesch's motion be denied, and that the amended complaint be dismissed with prejudice. Unless otherwise indicated, the material facts are either not in dispute or have been construed most favorably for Bruesch.

## I.     BACKGROUND

### A.     The parties

Bruesch is an inmate in the correctional system operated by the North Dakota Department of Corrections and Rehabilitation (DOCR). Bruesch was housed at the North Dakota State Penitentiary (NDSP) in Bismarck, North Dakota until April 2, 2013, when he was transferred to the James River Correctional Center (JRCC) in Jamestown. North Dakota, where he is currently incarcerated.

Bruesch's amended complaint names as defendants Robyn Schmalenberger, Patrick Branson, Tammy Homan, Darlyn Kunz, and Marlane Middlestead in both their official and individual

capacities. Defendants are all present or former employees of the NDDOCR. Schmalenberger was the NDSP Warden when this action was commenced but has since resigned her position and is no longer employed by the DOCR. Branson was the NDSP Deputy Warden until his retirement on August 31, 2013. Homan and Kunz were mail clerks at the NDSP, and Middlestead was a mail clerk at the JRCC.

### B.    Summary of the allegations

Bruesch's amended complaint sets forth ten claims. The first nine relate to when he was incarcerated at the NDSP and the tenth to his present incarceration at the JRCC.[1] Most of Bruesch's claims relate to the censorship of various pieces of incoming and outgoing mail by one or more of the defendants, which he claims resulted in a violation of his First Amendment and due process rights. Complicating this matter is the fact that the NDSP's written mail policies changed effective January 8, 2013, and that some of the violations that Bruesch is claiming occurred before the change and some after. For ease of understanding, the individual claims will be addressed in chronological order starting with the oldest alleged violation.

### C.    Relief requested

Bruesch seeks an award of both general and punitive damages. He also seeks injunctive relief against prison officials continuing to enforce unconstitutional mail policies and further First Amendment violations.

---

[1] Bruesch filed an initial complaint alleging mail violations while he was at the NDSP. Before the court could screen the complaint prior to service, Bruesch filed a motion to amend to add an additional claim relating to mail violations at the JRCC. Following a screening of the material, the court ordered the clerk to append the proposed amendment to the original complaint and treat the pleadings together as Bruesch's first amended complaint for service upon defendants. (Doc. No. 13).

## II.    GOVERNING LAW

### A.    Summary judgment

The law governing summary judgment is well known to the court and need not be repeated here.  E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Barnhardt v. Open Harvest Co-op., 742 F.3d 365, 369 (8th Cir. 2014).

### B.    First Amendment rights relating to the receipt or transmission of prison mail

Generally, inmates possess a First Amendment right to send and receive mail.  Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).  This right, however, is a qualified one because of the inmate's status as a prisoner and the countervailing penological interests of the state.  See, e.g., Beard v. Banks, 548 U.S. 521, 528 (2006) ("Beard"); Overton v. Bazzetta, 539 U.S. 126, 131-32 (2003) ("Overton"); Turner v. Safley, 482 U.S. 78, 84-85 (1987) ("Turner").  Consequently, the strict-scrutiny standard, which otherwise governs an abridgement of First Amendment rights in a non-prison setting, does not apply.

Instead, prison mail policies (as well as individual acts of censorship) are normally reviewed under the four criteria set forth in Turner to determine whether they are reasonably related to legitimate penological interests.  See id.; Holloway v. Magness, 666 F.3d 1076, 1080 (8th Cir. 2012); Kaden v. Slykhuis, 651 F.3d 966, 968-69 (8th Cir. 2011) (per curiam) ("Kaden"; Murphy v. Mo. Dept. of Corr., 372 F.3d 979, 985-86 (8th Cir. 2004) ("Murphy").  The Turner criteria represent a compromise between the fact that prisoners retain their First Amendment rights as a general matter and the need to give substantial deference to the judgment of prison administrators given the complex and often intractable problems involved in running a prison.  See id.

The four Turner criteria are:  (1) whether there is a rational connection between the

regulation and a neutral and legitimate governmental interest; (2) whether alternative means exist for the inmates to exercise their constitutional rights; (3) the impact of accommodating that right on other inmates and prison personnel; and (4) whether reasonable alternatives to the regulation exist. Turner, 482 U.S. at 89-90; Kaden, 651 F.3d at 968. These criteria are simply factors to review in determining whether the policy or action in question is reasonably (and not just logically) related to a legitimate penological interest. Prison officials need not meet all, or even a majority, of the criteria for the policy or action to pass constitutional muster. See, e.g., Beard, 548 U.S. at 533.

Before prison officials censor any particular item of mail, they must review its contents to determine whether it can be restricted in accordance with the foregoing principles. E.g., Kaden, 651 F.3d at 969. And, when an inmate mounts a First Amendment challenge to an act of censorship, this court must conduct its own independent review of the evidence to determine whether there has been an "exaggerated response to prison concerns," rendering the act of censorship unconstitutional. See Kaden, 651 F.3d at 969 (quoting Williams v. Brimeyer, 116 F.3d 351, 354 (8th Cir. 1997)); Murphy, 372 F.3d at 986. The burden of persuasion with respect to any constitutional violation, however, remains with the inmate. Beard, 548 U.S. at 529 (citing Overton for the inmate having the burden of persuasion); Overton, 539 U.S. at 132 ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.").

**C.      Procedural due process right to administrative review of censored mail**

The Supreme Court held in Procunier v. Martinez that censorship of a particular item of prison mail must be accompanied by minimum procedural safeguards. 416 U.S. 396, 417 (1974), overruled on other grounds by, Thornburgh v. Abbott, supra; Bonner v. Outlaw, 552 F.3d 673, 676 (8th Cir. 2009). The Court in that case approved a requirement imposed by the district court that

the inmate be notified of the act of censorship and be permitted to protest the decision to a prison official other than the one who made the original decision.  <u>Procunier v. Martinez</u>,  416 U.S. at 418-19.  The Court did not say, however, this was the only manner in which due process could be satisfied.

     **D.**     **<u>Qualified Immunity</u>**

Qualified immunity shields a government official from liability "unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Loch v. City of Litchfield</u>, 689 F.3d 961, 965 (8th Cir. 2012) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Consideration of a claim of qualified immunity requires a two-pronged inquiry: "(1) whether there is sufficient evidence the officer violated a constitutional right, and (2) whether the constitutional right [the officer violated] was so clearly established at the time of the alleged violation that a reasonable officer would have known that his conduct was unlawful."  <u>Atkinson v. City of Mountain View, Mo.</u>, 709 F.3d 1201, 1211 (8th Cir. 2013) (quoting <u>Rohrbough v. Hall</u>, 586 F.3d 582, 585 (8th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

"When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right."  <u>Bishop v. Glazier</u>, 723 F.3d 957, 961 (8th Cir. 2013).  While the law favors resolution of the claim of qualified immunity at the earliest possible stage, it is not appropriate to grant qualified immunity prior to trial when there are disputed facts material to the issue.  <u>Atkinson v. City of Mountain View, Mo.</u>, 709 F.3d at 1212.

## III.   DISCUSSION

### A.   Overview

In their motion for summary judgment, defendants have submitted several affidavits in which the affiants proffer explanations for why the mail items in question were properly censored. Unfortunately, for several of the items, the explanations provided by the affiants reference written mail policies which were not in effect at the time the mail items were rejected.  When Bruesch pointed this out in his response and offered evidence which suggested that for some of the items the contemporaneous reasons offered for their censorship were different, defendants simply objected on the grounds that Bruesch had not provided proper foundation for his evidence (even though most of it is obviously genuine) rather than addressing more forthrightly what actually occurred.

If the court was restricted to considering only what defendants have submitted as they have urged, the result may very well have been that their motion for summary judgment with respect to several of the mail items would have to be denied because of the problems existing on the face of their proffered evidence.  Fortunately for defendants, Bruesch has proffered a more complete record of what actually took place for these mail items that the court can rely upon.

### B.   Censorship of Elite Paralegal Services letter on May 16, 2012 (Claim No. 5)

#### 1.   Additional background

##### a.   Bruesch's allegations

Bruesch alleges that a letter from Elite Paralegal Services ("EPS') was rejected by mail clerk Homan because it contained "catalog/internet" information.  Bruesch contends this was not a sufficient reason and that his First Amendment rights were violated as a consequence.  He also contends that his due process rights were violated because, when he appealed the act of censorship,

the reviewing official purportedly gave a different reason for why the EPS mail item was properly withheld. Bruesch contends this denied him due process because he was not given the opportunity to address the reason given by the reviewing officer. (Doc. No. 12).

### b. Defendants' argument for summary judgment

Defendants state in their summary judgment brief that the EPS mail item was censored for the reasons given by defendant Homan in an affidavit filed in support of the motion in which she stated with respect to the EPS mail item:

> 9. On May 16, 2012, a piece of mail from Elite Paralegal Services (EPS) arrived at NDSP addressed to Bruesch (EPS Mail). I inspected the EPS Mail and discovered a catalog and internet information regarding pen-pal ads and a pamphlet on pen-pal ads. *I rejected the EPS Mail as a violation of DOCR Mail Policy because it violated DOCR's rules prohibiting the solicitation or commercial advertising for pen-pals.* My actions with respect to the EPS Mail were taken in accordance with DOCR Mail Policy. See Attach. 4.

(Doc. No. 39-3, p. 4) (italics added). Then to support their argument that the EPS mail item violated the DOCR's mail policies, defendants referred the court to paragraphs (6)-(7) of part B of the DOCR's current mail policy, which reads in its entirety as follows:

B. Inmate Correspondence:

> 1. The unit manager may recommend the imposition of a limit to the volume of an inmate's mail when it presents safety, security, or cleanliness and order concerns. If the COS approves the limitation, the inmate shall be notified in writing.

> 2. The COS may impose limitations on correspondence that may be necessary to ensure the safety and orderly running of the institution.

> 3. Mail received during normal business hours, excluding emergency situations, will generally be delivered within 48 hours after it has been processed, and packages within 72 hours after they have been processed. (4-4495) Mail that is in violation of the institution's mail, contraband, and property regulations will not be delivered.

> 4. Deliberate violations of rules and regulations by inmates may result in disciplinary action or referral for prosecution to appropriate authorities.

7

5.      Social correspondence that cannot be screened for security purposes including electronic social sites such as Internet Pen Pal pages, Facebook and MySpace are prohibited and constitute unauthorized contact with the public.

6.      Inmates are prohibited from using mail to solicit or otherwise commercially advertise for money, goods, or services. For the purposes of this rule this includes advertising for pen-pals.

7.      Inmates are not prohibited from corresponding with pen pals, but inmates are prohibited from placing advertisements that solicit pen pals. Inmates who post advertisements or have advertisements posted with the assistance of another individual, including family members, and including advertisements in printed or electronic media, will be subject to disciplinary action.

(Doc. No. 39-1, p. 4).

The problems with the foregoing, as Bruesch pointed out in his response, are that:

(1)      The DOCR policies that defendants cite to did not become effective by their terms until January 8, 2013. (Doc. No. 39-1, p. 1).

(2)      The written mail policy in place at the time the EPS mail item was rejected (*i.e.*, the 2011 mail policy) did not contain the explicit prohibitions contained in the paragraphs (6)-(7) of the present mail policy that form the basis for the italicized reason for denial stated by Homan in her affidavit. (Doc. No. 44-2, p. 4). Rather, the only reference in the 2011 mail policy to pen-pals was in the following provision under the "Inmate Correspondence" section:

5.      Any social correspondence that cannot be screened for security purposes including electronic social sites such as Internet Pen Pal pages, Facebook and MySpace are prohibited and will be considered unauthorized contact with the public.

(Doc. No. 44-2, p. 4). This provision is essentially the same as that carried forward as paragraph 5 in the 2013 policy.

(3)      Defendant Homan in her contemporaneous rejection of the written EPS mail item

using the NDSP's standard "Rejection of Mail" form made no mention of any pen-pal policy, stating only that the item was rejected because it was "Catalog/Internet info from EPS." (Doc. Nos. 32-8; 39-3, p. 4). As noted next, this may have been in reference to a separate policy, which the NDSP had at the time and has since modified, that prohibited prisoners from having catalogs in their cells.

To address the forgoing, defendants in their reply submitted an affidavit from DOCR Director LeAnn Bertsch in which she states that the DOCR did have a policy addressing pen-pals when the EPS mail item was censored, albeit not quite as well-developed as the present policy. She also offered as another justification for the act of censorship the prohibition against prisoners having catalogs in their cells. Director Bertsch stated:

4.    Nicholas Bruesch (Bruesch) alleges in his "Plaintiffs Answer to Defendants Cross-motion for Summery Judgement" (sic) that DOCR did not have a policy regarding the solicitation of pen pals until April of 2013. However, in November 2011, a policy was enacted that prohibited any correspondence that came about due to electronic social media sites such as internet pen pal pages (2011 Policy).

5.    The 2011 Policy was enacted because internet sites, including those advertising for pen pals, cannot be screened for security purposes and this poses a risk to the safety and orderly running of the institution and may also be contrary to the treatment and rehabilitation of the inmates within the institution.

6.    Effective January 8, 2013, the 2011 Policy was amended to further clarify DOCR's pen-pal policy (2013 Policy). The 2013 Policy carried over nearly identical language from the 2011 Policy, but added additional language to make it clear inmates could correspond with pen-pals, they just could not advertise or solicit for pen-pals, or have third parties advertise or solicit for pen-pals on their behalf.

7.    The 2013 Policy was updated in response to recent developments in case law and to provide clarity for both DOCR staff and inmates.

8.    Prior to the issuance of the 2013 Policy, inmates were prohibited from receiving catalogs, unless approved by the appropriate property office.

9.    The 2013 Policy now allows inmates to receive catalogs, provided the catalog does not present any safety, security, or institutional order or discipline problems for the facility, or to any individual, or the public, is not contrary to the treatment and

rehabilitation of the inmate, and does not violate DOCR contraband rules.

(Doc. No. 44-1). The policy prohibiting inmates from having catalogs in their cells at the time of

the receipt of the EPS mail item was set forth in the 2011 version of the Inmate Handbook and read

as follows:

> e.    Catalogs Sales and Retail store sales: Catalogs are available for your use in the
> library and housing units. You are not permitted to have catalogs in your cell. You
> are allowed to order approved property items through catalogs using a money
> transfer and an addressed, stamped envelope.

(Doc. No. 44-2, p. 20).

### c.   Additional facts

As noted earlier, Bruesch was given notice of the rejection of the EPS mail item by defendant

Homan, who stated it was being censored because it was "Catalog/Internet info from EPS." (Doc.

Nos. 32-8, p. 1; 39-3, p. 4). Bruesch appealed the denial by sending a "kite" (*i.e.*, a prisoner request

for information) to prison official Denise Senger in which he stated:

> Got a mail rejection from EPS today the 16th. Im appealing it. Elite Paralegal Servic, deals
> with many inmate services. Can you check it out for me?

(Doc. No. 32-9, p. 1) (errors in original). Senger responded by stating: "I took a look at the

pamphlet and there is information in regards to Internet Services available." (Id.). Then, when

Bruesch further complained about the matter, Senger responded that there was nothing in the EPS

mail that was "legal." Rather, "[t]here was an info pamphlet along with [sic] ordering erotic photos

of women." (Doc. No. 32-11).

Not satisfied with this response, Bruesch later complained about the denial of the EPS and

other items of mail to DOCR Director Bertsch. Director Bertsch responded on September 24, 2012,

stating in relevant part with respect to the EPS mail item:

> Finally, regarding Elite Paralegal and Prisoner Services ("EPS"), in addition to marketing

out of state legal services and charging for those services, which appears to be against the law in North Dakota, EPS also sells flowers, music, and what EPS itself describes as catalogs of photos which EPS itself recognizes may be prohibited in prisons.

(Doc. No. 43-3).

## 2.     The merits of the EPS mail claim

Neither party has submitted the actual EPS mail material for the court's review. According to Homan's after-the-fact affidavit, the EPS material contained catalog and internet information regarding pen-pal ads and a pamphlet on pen-pal ads. This is consistent with officer Senger who, upon review, noted the pamphlet contained internet information and a pamphlet for ordering erotic photos of women as well as the description later given by Director Bertsch. In the absence of Bruesch proffering evidence reasonably suggesting something else, the court must rely upon these descriptions for the content of the censored material. Cf. Beard, 548 U.S. 529-33.

Defendants contend that censorship of pen-pal material of the type involved with the EPS mailing is permissible for the reasons articulated in cases that have upheld censorship of comparable pen-pal material. See, e.g., Perry v. Sec'y, Florida Dep't of Corr., 664 F.3d 1359, 1363-67 (11th Cir. 2011) (prison policy that prohibits inmates from soliciting or otherwise commercially advertising for pen-pals satisfies the four Turner factors and is constitutional); Woods v. Comm'r of the Ind. Dep't of Corr., 652 F.3d 745, 748-51 (7th Cir. 2011) (prison policy prohibiting inmates from advertising for pen-pals is reasonably related to the legitimate penological objective of preventing inmate fraud, satisfies the four Turner factors, and is constitutional); Argentino v. Dormire, No. 09-4217-CV-C-SOW, 2012 WL 27672 (W.D. Mo. Jan. 4, 2012) (prison policy prohibiting inmates from soliciting for pen-pals, corresponding with persons or groups marketing advertising services, or subscribing to advertising services satisfies the four Turner factors and is constitutional);

Wilkerson v. Marshall, No. C93-0579, 1993 WL 303716 (N.D. Cal. July 28, 1993) (rule against advertising for pen-pals satisfies Turner factors and is constitutional).

While it appears defendants erroneously assumed in their initial briefing that the DOCR's present mail policies were in effect when the EPS mail item was censored, it does appear based on the Bertsch affidavit that there was a policy prohibiting pen-pal material of this type in place, albeit not as well-developed in written form, and that this policy did not violate the First Amendment for the reasons articulated in the above-cited cases. Further, even if there was no specific policy or prison officials failed to follow the literal wording of the 2011 mail policy, there was no First Amendment violation because it would have been constitutionally permissible for defendants to have censored the EPS mail item in any event based upon the reasoning of the cases cited by defendants.[2] See Lee v. Tahash, 352 F.2d 970, 972-73 (8th Cir. 1965) (erroneous application of prison mail policy without more does not amount to a constitutional violation).

As for Bruesch's complaint that he was not told when the EPS mail item was initially rejected by the mail room clerk that it related to pen-pals, Bruesch was provided with written notice of the denial (albeit not as specific as he would have liked) and allowed the opportunity to have the censored material reviewed by another person, who did review the material and determined it was inappropriate. This alone would likely have been enough to satisfy the minimum due process required by Procunier v. Martinez. However, here there was more. Bruesch interacted a second time with the person who conducted the initial review, who further discussed the reason why she denied his appeal. In addition, Bruesch was ultimately successful in obtaining a review by DOCR

---

[2] Also, as noted by Director Bertsch, the NDSP had in place at the time a policy of not allowing inmates to keep catalogs in their cells. And here, Bruesch made no attempt in his appeal to request that the catalog information be made available to him elsewhere.

Director Bertsch.  As a consequence, Bruesch received more than the minimal amount of due process that was required.

**C.**     **"Pacific Island Connection" catalog (Claim No. 6)**

      **1.**     **Additional background**

           **a.**     **Bruesch's allegations**

In Claim No. 6, Bruesch alleges that the censorship of an incoming "Pacific Island Connection" catalog on June 25, 2012 violated his First and Fourteenth Amendment Rights.  He contends that he and other prisoners had been permitted to receive material from Pacific Island Connection before and that the varying reasons given by defendants for the censorship of this particular item are indicative of their bad faith and harassment and in any event were specious.

           **b.**     **Defendants' argument for summary judgment**

Defendants, in their motion for summary judgment, attempt to justify the censorship of the "Pacific Island Connection" catalog based on it having contained sexually suggestive photographs of several women in violation of the NDSP's mail policies prohibiting such material.  In addition, they argue that the Pacific Island Connection catalog contained information regarding a pen-pal service and violated the NDSP's pen-pal policy.  (Doc. No. 39, p. 27).

In support of these arguments, defendants proffer an affidavit from Branson, which states in relevant part:

> 5.     On June 25, 2012, a piece of mail from Pacific Island Connection arrived at NDSP addressed to Bruesch (Pacific Island Mail).  I inspected the Pacific Island Mail and discovered it was a catalog that contained numerous photographs of a sexually explicit nature.  I rejected Bruesch's inmate request regarding the Pacific Island Mail because it was a violation of DOCR Mail Policy as it violated DOCR's rules regarding material that includes photographs containing sexually suggestive images including nudity or exposed genitalia, breasts or buttocks, either openly or through clothing.  In addition, the Pacific Island Connection catalog contained information regarding a pen-pal service.

(Doc. No. 39-2, p. 2).  They also appear to rely upon the DOCR's current mail policy that became

effective after this particular item was censored.  (Doc. Nos. 39, pp. 9, 26-27; 39-1).

Why defendants rely upon Branson's determination is somewhat puzzling since it ignores

the mail clerk's initial reason for rejection, the appeal of that decision to Warden Schmalenberger,

and a subsequent review by DOCR Director Bertsch, all of which call into question whether the

Pacific Island Connection catalog was ultimately rejected because it contained photographs that

were sexually suggestive within the meaning of the NDSP's mail policy.

### c.      Additional facts

It appears the initial rejection of the Pacific Island Connection catalog was not by Deputy

Warden Branson, but rather by mail clerk defendant Darlyn Kunz who forwarded to Bruesch a

completed "Rejection of Mail" form on June 25, 2012, stating that the Pacific Island Connection

mail was rejected because it was a "Catalogue from Pacific Island Connection."  (Doc. No. 32-12).

The next day, June 26, 2012, Bruesch appealed the rejection of the mail item by way of a kite

to NDSP Warden Schmalenberger.  Bruesch argued in his kite that he had been permitted to have

other correspondence from the Pacific Island Connection in the past.  He stated he had paid $45.00

for the catalog, which he characterized as a "magazine with female pictures and separate list of

addresses to write" and a "mail based pen-pal publication."  Also, in response to the mail clerk's

determination that the publication was a catalog, Bruesch argued it was not a "property catalog" for

ordering goods, such as shoes or art supplies, but rather a catalog of persons with whom he could

correspond, and that only the former were not allowed prisoners in their cells under the then current

policy.  (Doc. No. 32-13).

Warden Schmalenberger upheld the rejection of the Pacific Island Connection mail item

based on it being a catalog, writing to Bruesch in an undated communication:

> Mr. Bruesch,
>
> I reviewed the material from Pacific Island Connection. The material includes a catalog with photographs available for purchase.
>
> We do not allow catalogs.
>
> Robyn Schmalenberger

(Doc. No. 32-14). Notably absent from the Warden's rejection of the appeal was any mention that the photographs within the catalog were "sexually suggestive" within the meaning of the NDSP's mail policies.

Following the above action by Warden Schmalenberger, Bruesch attempted to get the matter reviewed again by sending a "kite" to Deputy Warden Branson on May 28, 2012. In the "kite," Bruesch stated that Warden Schmalenberger was wrong about the catalog offering pictures for sale because Pacific Island Connection did not offer pictures for sale. He further argued that he had on other prior occasions been permitted to receive "mail based" pen-pal publications of the same type as the Pacific Island Connection catalog. (Doc. No. 32-15). Deputy Warden Branson responded as follows:

> Nick - I read the flier and it is clearly a catalog. I can't address what they may have sent in the past but clearly this is a female photo sales catalog. Most of the female pictures shown <u>do</u> not pass screening for photos (page 34, letter f.) in the Inmate Handbook.

(Id.). As discussed later, paragraph f of the Inmate Handbook prohibits mail containing sexually suggestive material.

Finally, it appears that Bruesch's complaints about the Pacific Island Connection catalog having been censored reached DOCR Director Bertsch. She addressed the Pacific Island Connection mail item in the same September 24, 2012 letter to Bruesch in which she addressed the EPS mail

15

item.  Director Bertsch wrote in relevant part:

> This is in response to your grievances about the rejection of the Pacific Island Connection catalog.  It is just that – a catalog that sells names and addresses, sometimes phone numbers and e-mail addresses, of women, solicitation for ads, mailing lists, and dating and mail-order bride services.  The property office appears to have approved the purchase without reviewing it, but the mail room staff rejected it.  It was properly rejected by the mail room because it is stated in the inmate handbook that inmates may not have catalogs in their possession.  Because the property office did authorize you to order the catalog, the $45.00 cost of the catalog will be refunded to your spending account.

(Doc. No. 43-3).  Notably, Director Bertsch also made no reference to the material violating any mail policies prohibiting sexually suggestive material.

The provisions of the current mail policy effective January 8, 2013 that prohibit sexually suggestive material reads as follows:

> 5.)  The material includes photographs containing sexually suggestive images including nudity or exposed genitalia, breasts or buttocks, either openly or through clothing.
>
> * * * *
>
> 7.)  The material includes photographic portrayal of, or information on, bestiality, child nudity or child sexual activity, photographic portrayal of sexual activity including fellatio, cunnilingus, masturbation, ejaculation or sexual intercourse that shows actual penetration of any body cavity, or is in violation of federal or state criminal law.

(Doc. No. 39-1, p. 8).  These same prohibitions were in effect under the older policies at paragraphs 8(f) and (i) of the Inmate Handbook at page 34.  (Doc. No. 43-1, p. 4).

In this case, Bruesch submits a communication dated July 27, 2012 that he claims he received from the staff of Pacific Island Connection, which states:

> 7/27/2012
>
> Attn. Mr. Bruesch
>
> We do not sell the photos out our catalog.
> And, we do not have any nudity in our catalogs.
>
> Thanks for your interest,

(Doc. No. 32-20). While the record is not clear, it is likely that Bruesch used this letter when he complained about the denial of his access to the Pacific Island Connection catalog in his latter attempts to get the matter reviewed.

Finally, Bruesch submits as an exhibit in this case a copy of a Pacific Island Connection catalog containing photographs of a number of women that fits the characterization of the catalog described by Director Bertsch in her letter. (Doc. No. 43-5, conventionally filed). Bruesch alleges in his brief that the catalog filed with the court is a copy of the one that is at issue here (Doc. No. 43-4, p. 2), although defendants have objected to all of the exhibits tendered by Bruesch, claiming lack of foundation.[3]

It appears the Pacific Island Connection catalog that Bruesch filed was sent by him from the JRCC. If it is the same catalog that NDSP officials censored earlier (which will be assumed here for purposes of defendants' motion for summary judgment), no explanation has been provided as to how Bruesch gained access to it in order to submit it to the court - particularly if it is in violation of the DOCR's policy against receiving sexually suggestive material.

## 2.     Merits of Bruesch's Pacific Island Connection claim

The determination by the mail clerk initially and later by Warden Schmalenberger and Director Bertsch that the Pacific Island Connection pamphlet was a "catalog" (which prisoners were prohibited at the time from possessing in their cells) was not an unreasonable one. With respect to

---

[3] Apparently, the defendants' objection here is that Bruesch's statement in his brief that the catalog is the same one at issue was not sworn to under oath. If this objection was material to the undersigned's recommended disposition, Bruesch would have been given the opportunity to swear to the factual material set forth in his brief since he is proceeding pro se.

Bruesch's First Amendment claim, it does not appear he ever requested that the catalog be placed in one or more of the locations outside the prisoners' cells where they were allowed to view the catalogs. Further, it would have been constitutionally permissible for defendants to have censored the Pacific Island Connection catalog in any event, based on the case law cited earlier holding that restrictions on mail with commercial pen-pal services serve legitimate penological purposes.[4]

As for any due process claim, it is clear from the foregoing that Bruesch was given ample opportunity to voice his complaints about the Pacific Island Connection catalog and have its initial rejection reviewed by other prison officials.

### D.     RFD Press communication (Claim No. 1)

#### 1.     Additional background

##### a.     Bruesch's allegations

Bruesch alleges that a pen-pal company called "RFD Press" sent him a confirmation letter that purportedly contained a copy of an ad that Bruesch had earlier requested that RFD post in its publication along with his picture. Bruesch claims that defendant Homan censored this item on December 4, 2012, because it constituted a "3rd party mail violation." Bruesch claims this reason was bogus and that she censored the material because of a personal bias against the subject matter. According to Bruesch, the "RFD Press" is a gay, lesbian, bi-sexual, & trans-gender ("GLBT") pen-

---

[4] No recommendation is made with respect to defendants' claim that the Pacific Island Connection catalog was validly censored because it violated the DOCR's mail policies prohibiting sexually suggestive material. Based on the undersigned's review, Director Bertsch appears to have gotten it right in terms of this mail item being a catalog of women seeking husbands. Most of the women are fully clothed. A few are in swim suits with a couple in bikinis. And, while the women are obviously posing, it would be a stretch to suggest that the poses are any more sexually suggestive than a J.C. Penny catalog. It is likely for this reason that neither the mail clerk, nor Warden Schmalenberger, nor Director Bertsch contemporaneously concluded that the catalog violated the NDSP's rules prohibiting sexually suggestive mail. Finally, while it does not appear that the mail item must contain "nudity or exposed genitalia, breasts or buttocks, either openly or through clothing" (none of which appears to be the case from the copy the court has reviewed) for the material to be sexually suggestive within the meaning of the policy given its use of the word "including," the lack of any other criteria might render the policy too subjective.

pal company and the mail item was of that character. Bruesch claims he had been allowed to use the RFD Press in the past to post non-internet pen-pal adds. (Doc. Nos. 12, pp. 6-7; 51, pp. 5-6).

Bruesch also complains about the procedure that was used in affording him his right to a review of the RFD Press item with respect to his First Amendment complaints. Bruesch contends that the mail clerk did not provide him a notice stating the item had been censored so that, in his words, he could have brought a timely appeal. Rather, according to Bruesch, the mail clerk issued an "Incident Report," which initiated the prison's disciplinary process. Implicit in Bruesch's argument is that the disciplinary process did not provide sufficient due process to air his First Amendment objections. Bruesch also complains that he was not permitted to grieve his First Amendment claims using the NDSP's grievance process. (Id.).

### b.    Defendants' argument for summary judgment

Defendants contend that prison officials properly censored the incoming mail from the RFD Press because it violated the DOCR's mail policy prohibiting the solicitation or commercial advertising for pen-pals as well as using a third-party service to communicate with pen-pals. In support, they again rely upon the affidavit of defendant Homan, who stated the following with respect to her censorship of the RFD Press mail item:

> 4.      On December 24, 2012, a piece of mail from RFD Press arrived at NDSP addressed to Bruesch (RFD Press Mail). I inspected the RFD Press Mail and discovered a letter to Bruesch from RFD Press. This letter stated that RFD Press had received Bruesch's request for information about RFD Press' pen-pal advertising service and had submitted his information for the posting of a pen-pal ad. The RFD Press Mail included a photograph of Bruesch and Bruesch's contact information. The letter from RFD Press stated "[i]nmates use third party." I rejected the RFD Press Mail as a violation of DOCR Mail Policy because it violated DOCR's rules prohibiting the solicitation or commercial advertising for pen-pals. In addition, the RFD Press Mail indicated Bruesch was using RFD Press to post pen-pal ads, also in violation of DOCR Mail Policy. I issued Bruesch an incident report, as Bruesch violated DOCR Mail Policy in his communications with RFD Press. My actions with respect to the RFD Press Mail were taken in accordance with DOCR Mail Policy. See Attachment (Attach.) 1.

(Doc. No. 39-3, pp. 1-2).

### c.     Additional facts

Unlike what happened when the EPS and Pacific Island Connection mail items were censored, it does not appear that defendant Homan gave notice of the rejection of the RFD Press mail item using the NDSP's "Rejection of Mail" form.  Rather, it appears she submitted an "Incident Report" instead, in which she alleged:

> On Friday, December 24, 2010 around 10:00 am I was opening incoming mail.  I opened a letter from the RFD Press, Box 88, Liberty, TN 37095 addressed to Nick Bruesch 33812. In this envelope was a letter to Nick Bruesch saying that they have received his request for information and submitted his add [sic] to post his information.  This included a picture of inmate Nick Bruesch and information about him.  It stated "Inmates use third party".
>
> Inmate Nick Bruesch added this onto his info knowing full well that this is against our policy to use third party when sending in letters and other mail.

(Doc. No. 39-3, p. 6).  The record reflects that Bruesch received a copy of the "Incident Report" and that the allegation a violation of the mail policy had occurred was upheld by another prison official, who imposed a warning because it was Bruesch's first offense of this kind.  (Id.).

Bruesch then filed a grievance against defendants Homan and Kunz on January 4, 2013, claiming that they had continually violated his constitutional rights with respect to the handling of his mail, including most recently defendant Homan's handling of the RFD Press mail item.  More specifically, Bruesch claimed that Homan was "sexually harassing" him because of the nature of the RFD Press item and that both mail clerks had been violating his First Amendment rights.  Bruesch requested that the conduct of the mail clerks be investigated, that proper steps be taken to end the claimed sexual harassment, and that a person with knowledge of the First Amendment and due process requirements as they relate to the handling of prisoner mail be assigned to handle his mail.  (Doc. No. 32-1, p.1).

20

The prison staff's recommendation for an informal handling of the grievance focused upon the RFD Press item and stated:

> Upon investigation into this matter, you used a 3rd party to gain access to this website and publication which is a rules violation by you. No constitutional rights were violated and there is no proof of harassment. You violated a DOCR rule outlined in the Inmate Handbook.

(Id.). When Bruesch disagreed with this proposed resolution, the assigned grievance officer reached the following conclusion:

> You received a Level 1 report for violation of institutional mail rules about 3rd party mail. Therefore the issue cannot be grievanced. There is no evidence that you were discriminated against for sexual orientation.

(Id.).

Notably, the 2011 mail policy did impose restrictions upon inmate communications with prisoners in other facilities that fairly could be read as prohibiting inmate communications with other prisoners through a third-party service. (Doc. No. 44-2, p. 5). In addition, the mail policy stated in the section relating to "Inmate Correspondence" that violations "may result in disciplinary action or referral for prosecution to appropriate authorities." (Id. at p. 4).

### d. Merits of the "RFD Press" claim

Again, while defendants may have mistakenly relied upon the present mail policy in their initial briefing with respect to this mail item, the same reasons articulated above with respect to censorship of the EPS mail item apply to the RFD Press material as to why there was no First Amendment violation. In addition, it does appear the RFD Press mail item disclosed an apparent violation of the NDSP's rules prohibiting contact with prisoners in other institutions via third parties, and Bruesch has not carried his burden in demonstrating this prohibition did not serve a legitimate penological interest.

Bruesch also has not carried his burden of demonstrating a denial of due process. The disciplinary process used here did in fact provide for a review of the initial complaint by another prison official, and there does not appear to be anything that would have prohibited Bruesch from asserting his First Amendment rights as a defense. Consequently, it appears that the use of the disciplinary process satisfied the minimum due process required by Procunier v. Martinez in terms of notice and an opportunity to be heard. Cf. Shakur v. Selsky, 391 F.3d 106, 118-119 (2d Cir. 2004) (use of prison disciplinary proceeding provided sufficient due process and defendants were not required to use review process otherwise afforded for reviewing restricted materials).[5]

Finally, there is no constitutional requirement that prisoners be allowed to use a prison grievance process to address censorship of their mail. The only requirement is that some modicum of due process be afforded, which was done in this instance.

### E. "Andrew" and "Gibson" communications (Claim Nos. 2-4)

#### 1. Additional background

##### a. Bruesch's allegations

Bruesch alleges with respect to Claim No. 2 that defendant Homan censored an incoming item of mail from pen-pal Lane Andrew on January 4, 2013, and that he was not made aware of it until five days later when Homan initiated the disciplinary process with respect to the mail item. Bruesch goes on to allege in Claim No. 3 that he attempted to send an outgoing letter to Andrew to inform him that his letter had been rejected and the reason for the rejection, but this letter was also censored by Homan on January 22, 2013, and not allowed to go out. Bruesch alleges that defendant

---

[5] Bruesch contends that he did not have the opportunity for further appeal because the Incident Report was only for a Level 1 violation. Procunier v. Martinez, however, did not require that a prisoner be given a full complement of administrative review and, in that case, concluded review by one other prison official was sufficient.

Homan initiated a second disciplinary action with respect to this mail item along with several others which included an incoming letter from Martin Gibson that is, in part, the subject of Claim No. 4. (Doc. Nos. 12; 51, pp. 6-9).

In Claim No. 4, Bruesch complains about the censorship of the incoming letter from pen-pal Martin Gibson on January 22, 2013. Bruesch also states he tried writing to Gibson to tell him why he could no longer write him, but this outgoing letter was similarly censored by Homan and made the subject of a third disciplinary action. (Id.).

While Bruesch is not very specific as to why he claims his First Amendment rights were violated with respect to the censorship of the "Andrew" and "Gibson" correspondence, his argument appears to be that there was no good reason to deny him contact with these pen-pals. In addition, Bruesch complains again about the procedure that was used, *i.e.*, the use of the disciplinary process in lieu of a separate notice of the rejection of the mail items and an ability to obtain review from the decision set forth in the notice. Bruesch also complains again about the lack of a separate right to grieve the denial of his First Amendment rights through the prison grievance process. (Id.).

### b. Defendants' argument for summary judgment

Defendants in moving for summary judgment again state that the "Andrew" and "Gibson" correspondence were all properly censored because they violated or otherwise subverted the NDSP mail policies prohibiting the solicitation or commercial advertising for pen pals. In support, they again rely upon the affidavit of defendant Homan, wherein she states the following:

> 5. On January 4, 2013, a piece of mail from a Lane Andrew arrived at NDSP addressed to Bruesch (Lane Andrew Mail). I inspected the Lane Andrew Mail and discovered a letter to Bruesch from a Lane Andrew. This letter stated that Mr. Andrew had "saw an ad on prisonpals.com and thought I'd send you a letter." I rejected the Lane Andrew Mail as a violation of DOCR Mail Policy because it violated DOCR's rules prohibiting the solicitation or commercial advertising for pen-pals. I determined the statement from Lane Andrew indicated an internet pen-pal profile had been established for Bruesch, in violation of DOCR

Mail Policy. All correspondence in violation of DOCR Mail Policy may be rejected. I issued Bruesch an incident report, as Bruesch violated DOCR Mail Policy in his communications with Lane Andrew. My actions with respect to the Lane Andrew Mail were taken in accordance with DOCR Mail Policy. See Attach. 2, 3.

6.      On January 22, 2013, Bruesch attempted to send a piece of mail to a Lane Andrew (Andrew Return Mail). I inspected the Andrew Return Mail and discovered a letter to a Lane Andrew from Bruesch. This letter stated the Lane Andrew Mail was rejected and Bruesch advised Mr. Andrew to write again and not mention the pen-pal ad. I rejected the Andrew Return Mail as a violation of DOCR Mail Policy because it was an attempt by Bruesch to circumvent DOCR's rules prohibiting the solicitation or commercial advertising for pen-pals. In addition, the letter was correspondence arising out of a pen-pal ad posted by, or on behalf of, Bruesch, in violation of DOCR Mail Policy. I issued Bruesch an incident report, as Bruesch violated DOCR Mail Policy in his communications with Lane Andrew. My actions with respect to the Andrew Return Mail were taken in accordance with DOCR's Mail Policy.

7.      On January 22, 2013, a piece of mail from a Martin Gibson arrived at NDSP addressed to Bruesch (Gibson Mail). I inspected the Gibson Mail and discovered a letter to Bruesch from a Martin Gibson. This letter stated that Mr. Gibson obtained Bruesch's information from a website pen-pal advertisement. In addition, Mr. Gibson's letter was accompanied by a pamphlet. I discovered Mr. Gibson was not the publisher of the pamphlet. I rejected the Gibson Mail as a violation of DOCR Mail Policy because it violated DOCR's rules prohibiting the solicitation or commercial advertising for pen-pals and contained a pamphlet that did not arrive directly from the publisher. I determined the statement from Mr. Gibson indicated an internet pen-pal profile had been established for Bruesch, in violation of DOCR Mail Policy. All correspondence in violation of DOCR Mail Policy may be rejected. I issued Bruesch an incident report, as Bruesch violated DOCR Mail Policy in his communications with Martin Gibson. My actions with respect to the Gibson Mail were taken in accordance with DOCR Mail Policy. See Attach. 3.

8. Following the rejection of the Gibson Mail, Bruesch attempted to send a return letter to Mr. Gibson (Gibson Return Mail). I inspected the Gibson Return Mail and discovered a letter to a Martin Gibson from Bruesch. This letter stated the Gibson Mail was rejected and that Mr. Gibson can no longer write Bruesch. I rejected the Gibson Return Mail as a violation of DOCR Mail Policy because it was an attempt by Bruesch to circumvent DOCR's rules prohibiting the solicitation or commercial advertising for pen-pals. In addition, the letter was correspondence arising out of a penpal ad posted by, or on behalf of, Bruesch, in violation of DOCR Mail Policy. I issued Bruesch an incident report, as Bruesch violated DOCR Mail Policy in his communications with Martin Gibson. My actions with respect to the Gibson Return Mail were taken in accordance with DOCR's Mail Policy.

(Doc. No. 39-3, pp. 2-4).

### c.      Additional facts

As with the RFD Press mail item, there is no evidence that defendant Homan or any other

mail clerk advised Bruesch of the acts of censorship using the NDSP's "Rejection of Mail" form.

Rather, in each instance, disciplinary proceedings were instituted.

In the disciplinary complaint covering the incoming Andrew mail item, Homan alleged:

> On Monday, January 4, 2013, Tammy Homan, while processing incoming inmate mail, opened a letter addressed to inmate Nicholas Bruesch from sender Lane Andrew [address noted in complaint but redacted here]. In the letter, Mr. Andrew states he "saw ad on prisonpals.com and thought I'd send you a letter." This is indicating that an internet pen-pal profile has been made for inmate Nicholas Bruesch.

(Doc. No. 39-3, p. 7). It appears that a reviewing officer found the complaint to have merit since discipline was imposed on January 11, 2013. (Id.).

Defendant Homan initiated a second disciplinary action on January 28, 2013, for four pieces of outgoing mail, including the outgoing Andrew mail item that she censored on January 22, 2013, and one piece of incoming mail which was the first Gibson mail item. In her incident report, Homan claimed the following:

> While processing the outgoing mail, I reviewed (4) letters from inmate Nicholas Bruesch being sent to (4) separate people.
> (1) addressed to Michelle Samante [address redacted in original]
>      Inmate states he obtained her information from Pacific Island Connection pen pal ad.
> (2) addressed to Hannah Aide [address redacted in original]
> (3) addressed to Joylin Baucus [address redacted in original]
>      In (2) and (3) inmate advises them to see his ad on prisonpenpals.com.
> (4) addressed to Lane Andrew [address redacted in original]
>      Inmate states prior letter from Mr. Andrew was rejected. Mr. Andrew obtained inmate info from prisonpenpals.com ad. Inmate advises Mr. Andrew to write again but not to mention the penpal ad.
>      Incoming letter from Martin Gibson [address redacted in original] addressed to inmate Nicholas Bruesch states he obtained inmate info from website pen pal ad.

(Doc. Nos. 32-7; 39-3, p. 8). It appears a reviewing officer later found the charges set forth in the incident report to have merit since discipline was imposed on February 5, 2013. (Doc. No. 32-7).

According to Homan's affidavit, she prepared a third incident report for the Gibson outgoing mail. While this report has not been made a part of the record, there is no reason to believe it was handled any differently.

In summary, it is clear from the foregoing, as well as what Bruesch has himself acknowledged, that he was advised of the censorship of the Andrew and Gibson correspondence through the incident reports that initiated the disciplinary process as well as the reasons for why the mail items were censored.

### 2. Merits of the "Andrews" and "Gibson" correspondence claims

The Andrew outgoing mail item and the two Gibson mail items clearly violated the NDSP mail policies that went into effect on January 8, 2013, which specifically prohibited solicitation and commercial advertising for pen-pals. The incoming Andrew mail item, which was censored on January 4, 2013, likewise appears to have violated the NDSP's earlier pen-pal policy, even though it was not as clearly defined, for the reasons discussed in connection with the RFD Press mail item. And, since the present and earlier mail policies do serve a legitimate penological purpose for the reasons discussed in the cases cited earlier, there was no substantive First Amendment violation.

As for Bruesch's complaints of lack of due process, what was said earlier with respect to the RFD Press claim applies here. That is, Bruesch was afforded sufficient due process through the disciplinary process and had no constitutional right to utilize the prison grievance process to address his First Amendment claims.

### F.   Claim Nos. 7-8

Claims 7-8 do not set forth additional substantive claims. (Doc. No. 12, pp. 13-14). Consequently, they do not have to be addressed further.

### G.   Claim No. 9

In Claim 9, Bruesch contends that he was punished when his family set up a pen-pal website for him and that this violated his rights under the First and Fourteenth Amendments. However,

Bruesch provides no evidence of any of the particulars and, in any event, has not demonstrated that he was disciplined apart from specific items of either incoming or outgoing mail that were determined to have violated prison mail policies that serve a penological purpose. Hence, Bruesch has failed to demonstrate constitutional violation.

### H. JRCC mail claims (Claim No. 10)

Bruesch claims that his First and Fourteenth Amendment rights continued to be violated after he was transferred to the JRCC. He alleges in conclusory fashion that defendant Middlestead wrongfully censored numerous items of both his incoming and outgoing mail. With respect to these allegations, however, Bruesch failed to plead any specific facts, including failing to make reference to any particular items of mail. For this reason, his conclusory allegations are subject to dismissal. See Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004) (although liberally construed, *pro se* complaint must still allege sufficient facts to support claim advanced). Further, even if not, Bruesch has failed to marshal sufficient facts and arguments demonstrating a constitutional violation in response to defendants' motion for summary judgment.

### I. Other defenses

#### 1. No claim for damages against defendants in their official capacities

In this case, all of the defendants are state employees. Under governing law, Bruesch's claims against them in their official capacities are claims against the State of North Dakota which has immunity under the Eleventh Amendment from any claim for damages pursuant to 42 U.S.C. § 1983. See, e.g., Murphy v. State of Ark., 127 F.3d 750, 754 (8th Cir. 1997).

#### 2. Qualified immunity

Since Bruesch has failed to demonstrate any constitutional violation, defendants' claims of

qualified immunity need not be considered further.

IV.   **RECOMMENDATION**

Based on the foregoing, it is hereby **RECOMMENDED** as follows:

1.    Defendants' motion for summary judgment (Doc. No. 38) be **GRANTED**;

2.    Bruesch's motion and amended motion for summary judgment (Doc. Nos. 31 & 50) be **DENIED**.

3.    Bruesch's amended complaint be **DISMISSED WITH PREJUDICE**.


**NOTICE OF RIGHT TO FILE OBJECTIONS**

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 10th day of December, 2014.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge